2014-1663, -1664, -1665

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

REALTIME DATA, LLC

*Plaintiff-Appellee*,

v.

CME GROUP, INC., BOARD OF TRADE OF THE CITY OF CHICAGO, INC., and NEW YORK MERCANTILE EXCHANGE, INC.,

*Defendants-Appellants*,

and

BATS TRADING, INC., AKA BATS EXCHANGE, INC., INTERNATIONAL SECURITIES EXCHANGE, NASDAQ OMX GROUP, INC., NASDAQ OMX PHLX, INC., NYSE EURONEXT, OPTIONS PRICE REPORTING AUTHORITY, NYSE ARCA, INC., NYSE AMEX, LLC, and SECURITIES INDUSTRY AUTOMATION CORPORATION,

*Defendants*.

**Appeals from the United States District Court for the Southern District of New York in case nos. 1:11-CV-6697, 1:11-CV-6699 and 1:11-CV-6702 - KBF,  Judge Katherine B. Forrest**

# BRIEF FOR DEFENDANTS – APPELLANTS CME GROUP, INC., BOARD OF TRADE OF THE CITY OF CHICAGO, INC., AND THE NEW YORK MERCANTILE EXCHANGE, INC.

September 29, 2014

SCOTT PARTRIDGE
MICHAEL HAWES

BAKER BOTTS, LLP
910 Louisiana St.
Houston, TX  77002-4995
Telephone:   (713) 229-1750
Facsimile:    (713) 229-7750

*Attorneys for Defendants-Appellants*
*CME Group, Inc.; Board of Trade of the*
*City of Chicago, Inc.; and the New York*
*Mercantile Exchange, Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

REALTIME DATA, LLC     v.     CME GROUP, INC.

No. 2014-1663, -1664, -1665

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

CME Group, Inc., Board of Trade of the City of Chicago, Inc. and New York Mercantile Exchange, Inc., certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

**CME Group, Inc., Board of Trade of the City of Chicago, Inc. and New York Mercantile Exchange, Inc**

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

**CME Group, Inc**

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

**CME Group, Inc.**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

**Baker Botts, LLP: Scott Partridge, Michael Hawes, Amanda Woodall, Eliot D. Williams, Lisa Kelly, Paul Ragusa, Robert Riddle, Ali Dhanani, William Rothwell; Guy N. Harrison, Attorney At Law**

| | |
|---|---|
| September 29, 2014 | /s/ Michael Hawes |
| Date | Signature of Counsel |
| | |
| | Michael Hawes |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: __All Counsel of Record__

# TABLE OF CONTENTS

I. STATEMENT OF THE ISSUES ............................................................1

II. STATEMENT OF THE CASE..............................................................2

    A.  Preliminary Statement................................................................2

    B.  Factual and Procedural Background ...........................................5

         1. The district court rejected Realtime's only infringement theory in its claim construction order........................................................5

         2. Following claim construction, Realtime prolonged the litigation in bad faith...................................................................................8

         3. The court's summary judgment order found that Realtime's infringement theory had already been addressed at *Markman*. ............13

         4. CME incurred additional, unnecessary expenses litigating Realtime's bad faith assertions of privilege. ...........................................14

         5. Despite Realtime's extensive record of litigation misconduct, the district court denied CME's request for fees spent unnecessarily litigating this case post-*Markman*.......................................................16

III. SUMMARY OF THE ARGUMENT ................................................18

IV. ARGUMENT.....................................................................................20

    A.  Applicable Law and Standard of Review ..................................20

    B.  The District Court Should Be Reversed for Applying an Improper Legal Standard....................................................................................21

         1. The court based its ruling on the legally erroneous view that a plaintiff must be allowed to force full summary judgment briefing in order to appeal a claim construction..................................................21

         2. At the time of the claim construction order, the record contained detailed evidence establishing non-infringement..................................24

C.   The District Court Abused its Discretion in Declining to Award Fees
Given the Abundant Record of Realtime's Litigation Misconduct ...........26

1.  Realtime opposed summary judgment in bad faith...............................27

2.  Realtime filed for summary judgment of infringement in bad faith.....29

3.  Realtime asserted privilege in bad faith and refused to retreat from
those assertions until ordered to certify them. ......................................31

V. CONCLUSION ..................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bouldis v. US Suzuki Motor Corp.*,
711 F. 2d 1319 (6th Cir. 1983) ...................................................................30

*Cartner v. Alamo Group, Inc.*,
561 Fed. App'x 958 (Fed. Cir. Apr. 11, 2014) ...........................................23

*Chevron U.S.A., Inc. v. United States*,
110 Fed. Cl. 747 (Fed. Cl. 2013) ................................................................32

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F. 3d 1366 (Fed. Cir. 2008) .................................................................20

*Eltech Sys. Corp. v. PPG Indus., Inc.*,
903 F. 2d 805 (Fed. Cir. 1990) ...................................................................27

*Glynn v. EDO Corp.*,
Case No. 1:07-CV-1660, 2010 WL 3294347 (D. Md. Aug. 20, 2010) ................32

*Highmark Inc. v. Allcare Health MGanagement System, Inc.*,
134 S. Ct. 1744 (2014) ................................................................................20

*In re Morgan Stanley*,
417 F. App'x 947 (Fed. Cir. 2011) ...............................................................2

*Jang v. Boston Sci. Corp.*,
532 F.3d 1330 (Fed. Cir. 2008) ..................................................................22

*Kaneka Corp. v. Zhejiang Medicine Co.*,
No. 11-CV-2389, Dkt. No. 351 (C.D. Ca. May 23, 2014) ("*Kaneka*") at 8 ............
..................................................................................................4, 17, 21, 22, 23

*Kilopass Tech., Inc. v. Sidense Corp.*,
738 F. 3d 1302 (Fed. Cir. 2013) .................................................................23

*MarcTec, LLC v. Johnson & Johnson*,
664 F. 3d 907 (Fed. Cir. 2012) ..............................................................23, 28

*Mid-Continent Cas. Co. v. Eland Energy, Inc.*,
Case No. 3:7-MC-78, 2007 WL 948154 (D. Conn. Mar. 26, 2007) ....................32

*Octane Fitness v. Icon Health & Fitness,*
134 S. Ct. 1749 (2014)............................................................................20

*Phonometrics v. Westin Hotel Co.*,
350 F.3d 1242 (Fed. Cir. 2003) .......................................................23, 27

*Realtime Data, LLC v. Morgan Stanley, et al.*,
554 Fed. App'x 923 (Fed. Cir. 2014)...........................................viii, 2, 5, 7

*Shinyei Corp. of America v. United States*,
Case No. 2010-1178, 2010 WL 4146384 (Fed. Cir. 2010) ....................26

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
726 F.3d 1306 (Fed. Cir. 2013) ............................................................23

*Wilson Sporting Goods v. Hillerich & Bradsby*,
442 F.3d 1322 (Fed. Cir. 2006) ............................................................22

## STATUTES

28 U.S.C. § 1295(a)............................................................................... ix

28 U.S.C. §§ 1331 and 1338(a) .............................................................. ix

28 U.S.C. § 2107(a)............................................................................... ix

35 U.S.C. § 285 ....................................................................................20

# STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, Defendants-Appellants CME Group, Inc.; Board of Trade of the City of Chicago, Inc.; and New York Mercantile Exchange, Inc. (collectively, "CME") provide as follows:

**Previous Appeals:**    This Court previously heard appeals in the following cases, which were considered together:

- REALTIME DATA, LLC V MORGAN STANLEY, 2013-1092;[1]
- REALTIME DATA, LLC V CME GROUP, INC., 2013-1093;[2]
- REALTIME DATA, LLC V THOMSON REUTERS CORP., 2013-1095;[3]
- REALTIME DATA, LLC V CME GROUP, INC., 2013-1097;
- REALTIME DATA, LLC V THOMSON REUTERS CORP., 2013-1098;
- REALTIME DATA, LLC V MORGAN STANLEY, 2013-1099;

---

[1] The Defendants-Appellees in the Morgan Stanley cases were: Morgan Stanley and Morgan Stanley & Co., Inc.; The Goldman Sachs Group, Inc., Goldman Sachs & Co., and Goldman Sachs Execution & Clearing, LP; J.P. Morgan Chase & Co., J.P. Morgan Securities, Inc., and J.P. Morgan Clearing Corp. (formerly known as Bear, Stearns Securities Corp.); Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA), LLC; and HSBC Bank USA, N.A. and HSBC Securities (USA), Inc.

[2] The Defendants-Appellees in the CME Group, Inc. cases were: CME Group Inc., Board of Trade of the City of Chicago, Inc., and New York Mercantile Exchange, Inc.; BATS Trading, Inc. (also known as BATS Exchange, Inc.); International Securities Exchange; NASDAQ OMX Group, Inc. and NASDAQ OMX PHLX, Inc. NYSE Euronext, NYSE Arca, Inc., NYSE MKT, LLC (formerly known as NYSE Amex, LLC), and Securities Industry Automation Corporation; and Options Price Reporting Authority.

[3] The Defendants-Appellees in the Thomson Reuters Corp. cases were: Thomson Reuters Corp.; Bloomberg L.P.; FactSet Research Systems, Inc.; and Interactive Data Corp.

- REALTIME DATA, LLC V CME GROUP, INC., 2013-1100;
- REALTIME DATA, LLC V THOMSON REUTERS CORP., 2013-1101;
- REALTIME DATA, LLC V MORGAN STANLEY, 2013-1103.

A panel of Judges Lourie, Mayer, and Wallach issued an opinion affirming the district court on January 27, 2014 and denied rehearing on March 13, 2014. *See Realtime Data, LLC v. Morgan Stanley, et al.*, 554 Fed. App'x 923 (Fed. Cir. 2014).

**Related Cases:**    The following related cases are pending in this Court and will directly affect or be directly affected by this Court's decision in the pending appeal:

- REALTIME DATA, LLC V CME GROUP, INC., 2014-1663;
- REALTIME DATA, LLC V CME GROUP, INC., 2014-1664;
- REALTIME DATA, LLC V CME GROUP, INC., 2014-1665.

## JURISDICTIONAL STATEMENT

The U.S. District Court for the Southern District of New York had jurisdiction over the actions giving rise to these appeals under 28 U.S.C. §§ 1331 and 1338(a). The U.S. Court of Appeals for the Federal Circuit has jurisdiction over these appeals under 28 U.S.C. § 1295(a). The notices of appeal from the final judgment entered on June 24, 2014 were timely filed under FED. R. APP. P. 4(a) and 28 U.S.C. § 2107(a) on July 23, 2014. JA132-145; JA146-147.

# I. STATEMENT OF THE ISSUES

**Issue 1**:     Whether the district court, in denying CME's motion for fees, abused its discretion by applying an improper legal standard whereby a patent plaintiff may always—without risk of an exceptional case determination—ignore an unfavorable *Markman* ruling to force full summary judgment briefing of non-infringement regardless of the frivolousness of the infringement allegations in light of the district court's claim constructions.

**Issue 2**:     Whether the district court, in denying CME's motion for fees, abused its discretion by disregarding evidence of Realtime's litigation misconduct, including: pursuing rejected infringement theories that contradicted the district court's express rulings; filing a burdensome and vexatious motion for summary judgment; opposing CME's motions on frivolous grounds; and refusing to retreat from extensive, bad-faith assertions of privilege.

## II.  STATEMENT OF THE CASE

### A.    Preliminary Statement

Realtime Data LLC ("Realtime") sued CME and numerous other members of the financial industry for infringement of patents related to data compression. Realtime filed the cases in the Eastern District of Texas, but this Court issued a writ of mandamus instructing that they be transferred to the Southern District of New York. *In re Morgan Stanley*, 417 F. App'x 947, 950 (Fed. Cir. 2011).

After the close of fact discovery and service of expert reports, the district court issued a *Markman* ruling that adopted all of CME's proposed constructions. JA2286-87.  Three months later, the district court granted summary judgment of non-infringement on all asserted claims—stating that Realtime's opposing argument had already been addressed by the Markman ruling.   JA2322-26.[4] Realtime appealed, and this Court affirmed the district court *in toto*.  *Realtime Data, LLC v. Morgan Stanley, et. al.*, 554 Fed. App'x 923 (Fed. Cir. Jan. 27, 2014).

This appeal concerns Realtime's bad-faith conduct between the district court's *Markman* ruling and its grant of summary judgment.  During those three

---

[4] All citations to the district court's summary judgment of non-infringement are to the court's Amended Opinion & Order entered November 15, 2012.  JA2289-336. The court's original Opinion & Order granting summary judgment issued September 24, 2012.  JA2499-546.

months, Realtime vexatiously prolonged litigation and duplicated proceedings when no viable infringement theory against CME remained.

Critically, all of Realtime's asserted claims require determining a "data field type" or "data block type" (the "data type terms"). JA315  During the *Markman* hearing, CME presented Realtime's infringement contentions for those data type terms and demonstrated how CME's proposed constructions avoided infringement. JA192-99.  CME emphasized that "[t]his is a key issue in the case because it goes to noninfringement."  JA193 (241:3-11).  The district court's *Markman* order not only adopted CME's construction for the decisive data type terms (as well as every other term) but also expressly rejected Realtime's infringement theory.  JA2273. The order was therefore unambiguously case dispositive.

 Instead of accepting the court's decision by proceeding to final judgment and appeal, Realtime unjustifiably chose to press forward—forcing CME to incur substantial, unnecessary fees in connection with expert reports, expert discovery, pre-trial preparations, and summary judgment briefing.  Worse, Realtime's conduct following the claim construction order repeatedly employed bad faith and vexatious litigation tactics.  For example, Realtime filed a ***motion for summary judgment of infringement*** that ignored the district court's constructions and recycled the very claim constructions that the court had rejected, implausibly

representing that no issue of material fact existed as to CME's liability for infringement. JA323-76.

When the court ultimately granted summary judgment of non-infringement on the data type terms, it directly stated that "[t]he Court resolved this issue in connection with its *Markman* opinion." JA2325. CME moved for an exceptional case finding and narrowly tailored its request to the fees incurred in the three months between the district court's *Markman* ruling and its grant of summary judgment. JA154-81.

The district court denied CME's motion in a short order that did not substantively address the evidence of Realtime's misconduct. JA132-35. Instead, the court deferred to a recent district court decision, which it interpreted as holding that  even after a case-dispositive adverse claim construction, plaintiffs must be allowed to proceed to summary judgment of infringement, because otherwise  "an appellate court cannot properly exercise its appellate jurisdiction." JA134 (quoting *Kaneka Corp. v. Zhejiang Medicine Co.*, No. 11-CV-2389, Dkt. No. 351 (C.D. Ca. May 23, 2014) ("*Kaneka*") at 8).[5]

CME appeals the district court's adoption of an improper legal standard and its abuse of discretion in denying CME's request for fees.

---

[5] For the convenience of the Court, the *Kaneka* decision is provided in the joint appendix at JA2337-46.

**B.    Factual and Procedural Background**

**1.    The district court rejected Realtime's only infringement theory in its claim construction order.**

The asserted claims are directed toward data compression and decompression techniques, all of which require selecting a compression/decompression algorithm based on determining a "data field type" or "data block type." *See, e.g.*, *Realtime Data*, 554 Fed. App'x at 928-30 (describing the asserted claims); JA315. Realtime sought to construe those terms broadly as "an attribute or characteristic of the data residing in the data block (or data field)." JA2370. Realtime needed a broad construction, because its only infringement theory alleged that CME determined data types by "checking a data value." JA194 (242:6-10).

CME proposed a narrower construction where a data type referred to a *categorization* based on content, rather than merely any "attribute or characteristic." JA2409-15. CME's opening and responsive claim construction briefs argued that Realtime's "attributes or characteristics" construction erred by defining a data type to include data values themselves (e.g., the value "6" as a data type distinct from the value "7"). JA2414; JA2455.

At the claim construction hearing, CME presented Realtime's infringement theory on the data type terms and demonstrated that, if the district court agreed with CME's construction, then Realtime would no longer be able to assert

infringement on any claim.   For example, CME displayed screenshots from Realtime's infringement contentions to illustrate Realtime's reliance on the value-check theory:



JA225-27.

CME's attorney explained that whether the data type terms included checking data values was case dispositive:

> Basically, every time data field type or data block type was referenced [in the infringement contentions], it all went back to this same idea of checking a value.  So this is why this is a critical issue for your Honor to decide.  We need to know whether just checking a value is going to have the impact of determining the data type.

JA196 (244:19-23); *see also* JA198 (246:13-19) ("The way they are trying to argue infringement for determining the data type is looking for a specific value and saying that that is determining the data type.   Obviously, once you get to parameters and attributes, that is so broad, it's anything, that you can make that

leap. We don't believe that you ought to be able to make that leap from data type to data value."); JA235 ("Checking a data value IS NOT determining a data type").

In its ruling on claim construction, the district court both adopted CME's proposed constructions on all disputed terms and expressly rejected Realtime's infringement theory on the case-dispositive data type terms. JA2273. On those terms, the court found that "[t]he essential difference between the two constructions is that plaintiff's is broad enough to capture any characteristic or any attribute of data." JA2271. The court then explained that "Plaintiff argues that a 'data block type' or 'data field type' can constitute simply an attribute of data— that is, the expression of even a value of data" but "*checking a value is not determining a data block type or data field type.*" JA2273 (emphasis added).

The *Markman* order thus made clear that Realtime no longer had a viable infringement theory. Indeed, in its appeal of the claim construction to this Court, Realtime attacked the *Markman* order for "rel[ying] on extrinsic noninfringement-driven testimony" and argued that the district court had improperly construed the claims "with the objective of capturing or excluding the accused device." JA280. This Court found, however, that the district court had correctly construed all disputed terms and that Realtime had not alleged infringement "as required by the 'data field/block type' claim construction[.]" *Realtime Data*, 554 Fed. App'x at 935.

This litigation became exceptional when Realtime decided to impose costs on CME by pressing forward after the case-dispositive *Markman* order without a viable infringement theory.

### 2. Following claim construction, Realtime prolonged the litigation in bad faith.

For the three months between claim construction and summary judgment, Realtime unreasonably and vexatiously prolonged litigation by engaging in a pattern of bad-faith behavior, including: refusing to discuss issues meaningfully; levying accusations against the district court's integrity; filing a frivolous motion for summary judgment that ignored the *Markman* ruling by relying on the rejected construction and disallowed "checking a value" theory; opposing CME's summary judgment motion on the same basis; and refusing to withdraw literally thousands of bad-faith assertions of privilege.

On the day of the *Markman* ruling, the joint defendants e-mailed Realtime to schedule a meet-and-confer teleconference to discuss "[t]he implications of the Court's Markman Order." JA318.[6] During that call, they questioned how Realtime could proceed with the case in good faith given the court's rejection of every one of Realtime's claim construction positions. Realtime refused to explain

---

[6] Although the *Markman* Order is dated June 22, it posted to the Court's ECF on June 25. Defendants e-mailed Realtime approximately three hours later.

and responded that defendants would just have to wait and see Realtime's own summary judgment motion. *Cf.* JA321.

In a hearing two weeks later, Realtime questioned the district court's integrity, complaining that "the process that we have gone through has been one that [Realtime] think[s] has played to their great disadvantage" and that "somehow we have gotten off track." JA217 (5:13-17). Realtime also tacitly acknowledged the impact of the *Markman* order, saying that "if we don't have a process in this country that allows these gentlemen to have their day in court, it's a travesty[.]" JA218 (6:12-14). Judge Forrest responded that "to the extent that there is any thought or implication that the decisions that have been rendered by this Court have been the result of anything other than the Court's genuine consideration as to the merits of the case, that would be an unfortunate implication" and that "I have carefully considered the Markman issues that were presented to me[.]" JA219 (7:12-25); *see also* JA220 (8:4-9). She also reminded Realtime, "You just don't like my decisions. You will be able to appeal them[.]" JA221 (9:2-3).

Realtime then filed a motion for summary judgment that it knew could not succeed under the Court's *Markman* ruling, representing in bad faith that there were ***no disputed issues of fact regarding Defendants' infringement***. JA324-76. As CME's opposition explained, Realtime's "motion effectively ignores the body of this Court's claim construction order" and that "[f]or limitation after limitation,

Realtime attempts to recycle repudiated infringement theories without any regard for the construed legal meaning of the claim terms." JA382.

For example, the "data block type" section of Realtime's motion recited the district court's construction but then discarded it in the next sentence in favor of the rejected "characteristics" construction, recycling the same argument used in its unsuccessful claim construction briefs:

> "Data block types" has been construed by the Court as "categorization of the data in the field (or block) as one of ASCII, image data, multimedia data, signed and unsigned integers, pointers, or other data type." *The specifications of the patents-in-suit plainly make clear that a "data type" may be a characteristic of the data block*.

JA343 (emphasis added) (internal citations omitted).

The motion then brazenly applied that rejected "characteristics" construction, including reasserting the "value check" theory that the district court's claim construction order had expressly denied:

> For the default encoding technique, the data field (or block) type is also determined by analyzing the content of the data block to identify *whether the data block has a content that is the most common value* for that data block or field that is expected of the data block based on a priori knowledge of the data stream. As with other FAST field encoding techniques discussed above, *the 'most common value' is also a category or characteristic of the data block*[.]

JA344-45 (emphasis added) (internal citations omitted).

To support the motion, Realtime and its counsel created new so-called "data types" and had their expert Dr. Shamos recite them in an accompanying declaration (*e.g.*, the "most common value" data type):

> The default compression technique, for example, is applied to a data field containing data of ***data type 'most common value'*** when it is determined by examining the content of the data field that the data field contains the most common value for that data field[.]

JA446 (emphasis added). Those "data types" appear nowhere in the patents, infringement contentions, or infringement expert reports but instead emerged for the first time during summary judgment briefing alongside the rejected claim construction—a transparent attempt to circumvent the court's claim constructions. Indeed, Dr. Shamos testified that Realtime invented those "data types" after the *Markman* order. JA490 (554:10-556:14).

Realtime also submitted a bad faith Local Rule 56.1 "statement of undisputed material facts" accompanying its motion, which recited an oppressive 201 "facts" that unreasonably and vexatiously forced Defendants to prepare a 70-page counter-statement. JA494-580. As explained in that counter-statement, Realtime's list of facts (1) often did not cite any supporting evidence, in violation of the local rules; (2) included numerous "material facts" with no relevance to the issue of infringement; and (3) "the majority of the remaining statements [were] not 'facts' at all, but [were] instead argumentative infringement contentions." JA495.

And then, as the culmination of Realtime's bad faith in seeking summary judgment: After CME had to waste its time responding, Realtime abandoned the charade that summary judgment was warranted and told the court that it would "hold over" the motion "to be renewed post-trial" in order to "efficiently use the Court's time[.]" JA2196.

Realtime evidenced similar bad faith in opposing CME's motion for summary judgment of non-infringement, relying on the same rejected claim construction and repeating the same rejected infringement theory. *See, e.g.*, JA588 ("For the default encoding technique, the data field (or block) type is also determined by analyzing the content of the data block to ***identify whether the data block has a content that is the most common value* . . . *[T]he 'most common value' is also a category or characteristic of the data block***[.]") (emphasis added). Indeed, the very headings of Realtime's response brief recited the rejected value check argument: "CME's Accused Products [meet the "data block/field type" limitations] . . . ***Because They Both Check and Compare Values***." JA592.

Realtime also groundlessly disputed CME's statement of material facts, including disputing the statement "Checking whether data has a particular value does not categorize the data" that recited nearly verbatim the Court's *Markman* order: "checking a value is not determining a data block type or data field type"

and "'data field type' and 'data block type' refers to a content categorization."

JA606-07; *compare to* JA2273.

### 3. The court's summary judgment order found that Realtime's infringement theory had already been addressed at *Markman*.

When the district court granted CME's motion for summary judgment of

non-infringement on the data type terms, it unambiguously held that the only issue

in dispute had already been resolved during claim construction:

> It is clear from Realtime's description of how it performs this step, that it is performing a value check. The question is whether there is an issue of fact as to whether this value check can constitute content categorization. There is not. ***The Court resolved this issue in connection with its Markman opinion.***

JA2325 (emphasis added).

The Court also noted that Realtime failed to present any expert testimony

challenging the testimony from CME's expert that the "content check" at issue was

nothing more than a "value check." JA2325 ("Realtime argues the CME

Defendants' copy encoding technique determines whether the data block is

redundant of the corresponding data block in the prior message and that they

perform this step through a 'content check.' ***This is, as Dr. Storer states***

***(uncontradicted by Dr. Shamos), really a value check—not a content***

***categorization***[.]") (emphasis added).

**4.      CME incurred additional, unnecessary expenses litigating Realtime's bad faith assertions of privilege.**

At the same time that Realtime vexatiously prolonged litigation on the issue of infringement, it also engaged in a pattern of bad-faith conduct regarding inaccurate privilege assertions.  Two weeks before the close of discovery, after nearly three years of litigation, Realtime served a facially overbroad 1170-page privilege log that CME promptly challenged.  JA662-1831.  Over the course of the next four months, Realtime refused to retreat from its assertions of privilege and forced CME to expend time and money escalating from correspondence to meet-and-confer teleconferences to motion practice, which culminated in the district court's ordering partners at the firm representing Realtime to review the log and certify its accuracy.  Once faced with a requirement to certify, Realtime retracted over 90% of its privilege assertions—including log entries that, during motion practice, Realtime represented to the court that *it had already re-reviewed and confirmed.*  JA650; JA2495.

A full timeline of CME's efforts litigating the dispute is provided at pages 34-38, but to summarize:

- May 21: Realtime serves a privilege log comprising 11,585 entries. By comparison, Realtime had only produced approximately 37,000 non-source code documents (thousands of which were public documents such as court papers or PTO filings).

- June 5-July 19: CME and Realtime engage in detailed back-and-forth correspondence regarding deficiencies in Realtime's privilege log.

Realtime accuses CME of "trying to send Realtime on a baseless and time-consuming goose chase" and refuses to broadly reconsider its facially overbroad privilege assertions. JA1886.

- July 18-19: After repeated delays, Realtime participates in a meet-and-confer. To avoid motion practice, McKool promises to identify which documents it will produce the following day, but then sends a letter identifying only two documents. JA1896-902.

- July 20-August 30: CME initiates motion practice. JA657-60. In responsive letters to the court, McKool represents that it has re-reviewed substantial numbers of documents and confirmed the accuracy of all but a small number of privilege designations. *See, e.g.*, JA617. The court orders Realtime to provide selected documents from its log for *in camera* review. JA2494; JA2108-09. After reviewing them, the court finds "[a] number of documents do not appear to be privileged on their faces" and orders that "partner(s) from [Realtime's litigation counsel] should review all of the documents on the privilege log and certify that . . . whatever documents remain following the re-review meet the legal definition of what is in fact 'privileged' or 'work product.'" JA2470-72.

- September 20: McKool files a certification with the Court that, after re-review, only "756 documents (out of the original 11,585 documents) remain on Realtime's privilege log[.]" JA650; JA2495.

Thus, after months of defending the integrity of its original privilege log and representing to the Court that it had already re-reviewed a substantial number of documents, Realtime chose to withdraw over 90% of its privilege assertions and produce over 10,000 documents rather than certify the accuracy of its positions. JA650; JA2495. In doing so, Realtime not only forced CME to waste time and money needlessly litigating, but also delayed producing relevant documents until after fact discovery, expert reports, expert depositions, summary judgment briefing, and pre-trial preparation.

**5.    Despite Realtime's extensive record of litigation misconduct, the district court denied CME's request for fees spent unnecessarily litigating this case post-*Markman*.**

Realtime's insistence on reasserting a rejected claim construction and pursuing baseless claims of infringement following *Markman* caused CME to incur unnecessary legal fees, including fees relating to: preparing expert rebuttal reports on infringement; taking depositions of Realtime's technical experts and defending depositions of CME's own technical experts; preparing damages rebuttal reports; taking depositions of Realtime's multiple damages experts and defending the depositions of CME's damages expert; litigating CME's summary judgment motions and responding to Realtime's frivolous motions; litigating issues related to Realtime's privilege log; and pre-trial preparations, including compiling exhibit lists, preparing deposition designations, and drafting *in limine* and *Daubert* motions.

CME, pursuant to a schedule agreed by the parties,[7] moved for attorneys' fees after this Court affirmed both the district court's claim constructions and grants of summary judgment.  JA148-153; 154-181.  In its motion for fees, CME described Realtime's extensive record of litigation misconduct, asked that the Court make an exceptional case finding, and award fees incurred following the

---

[7] That agreement is memorialized in the Final Judgment.  FA2482 (extending time for attorneys' fees motions "to such date as the Court may set in the future"); *see also* JA2490 (setting briefing schedule).

*Markman* order until CME's Motion for Summary Judgment was granted. JA148; JA160.

The district court issued a short ruling denying CME's motion that contained no analysis of Realtime's behavior following the *Markman* order. JA132-35. Despite the extensive record of misconduct presented in CME's motion, the court focused on whether "plaintiff should have given up its case following the Court's claim construction." JA134. The court declined to award fees, citing a recent opinion from the Central District of California for the proposition that "[t]o hold that [plaintiff] had to give up its infringement suit after claim construction and prior to the trial court's adjudication of the infringement claim would put future plaintiffs in an untenable position" because they "would be unable to pursue a case dispositive order and therefore a suitable record for appeal without risking an award of attorney fees." JA134 (quoting and citing *Kaneka* at 8 (JA2344)).

CME now appeals from the district court's decision denying attorneys' fees.

## III.  SUMMARY OF THE ARGUMENT

The district court, in declining to grant CME's request for fees, abused its discretion both in the legal standard that it applied and its failure to consider the record.  First, the court deferred to an erroneous reading of a district court decision that a plaintiff must be allowed to proceed to summary judgment without risk of an exceptional case finding in order to create a record for appeal of claim construction.  That legal rule misapplies this Court's precedents, which have approved fee-shifting where a plaintiff prolongs litigation without a viable infringement theory after claim construction.

Applying the proper legal standard, the district court should have evaluated the objective merits of Realtime's litigation position from the time of its *Markman* order forward.  The record reflects that, weeks before that date, Realtime had completed discovery and committed to an infringement theory that was not viable based on the district court's claim constructions.  Indeed, when the court later granted summary judgment, it noted that the only relevant dispute on the case-dispositive issue had been resolved by the *Markman* order.

Second, the court failed to consider that Realtime not only prolonged litigation without a viable infringement theory, but that it did so vexatiously and in bad faith.  In particular, Realtime opposed summary judgment on frivolous grounds that directly contradicted the court's claim construction order—and then

went a step further and filed its own motion for summary judgment of infringement on those same grounds, which it withdrew only after CME wasted time and money responding.   Realtime also forced CME to spend months contesting a facially overbroad and admittedly inaccurate  privilege log, improperly withholding over 10,000 documents (more than 90% of the log) through fact discovery, expert reports, expert discovery, summary judgment briefing, and pretrial preparation.

# IV.  ARGUMENT

## A.    Applicable Law and Standard of Review

A court may award attorneys' fees to the prevailing party in "exceptional" patent litigations.  35 U.S.C. § 285   "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness v. Icon Health & Fitness,* 134 S. Ct. 1749, 1756 (2014).  Similarly, "[i]f the patentee prolongs litigation in bad faith, an exceptional finding may be warranted." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F. 3d 1366, 1379 (Fed. Cir. 2008).

"[A]n appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's § 285 determination."  *Highmark Inc. v. Allcare Health Management System, Inc.*, 134 S. Ct. 1744, 1749 (2014).  "The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."  *Highmark Inc. v. Allcare Health Management Sys., Inc.*, 134 S. Ct. 1744, 1748 n.2 (2014) (internal quotation marks and citations omitted).

**B.    The District Court Should Be Reversed for Applying an Improper Legal Standard**

**1.    The court based its ruling on the legally erroneous view that a plaintiff must be allowed to force full summary judgment briefing in order to appeal a claim construction.**

The court denied CME's motion for fees by relying on a reading of a district court decision, *Kaneka Corp. v. Zhejian Medicine Co.,* that misapplied this Court's precedents.  JA134 (quoting and citing  No. 11-CV-2389, Dkt. No. 351 (C.D. Ca. May 23, 2014) (JA2337-46)).  In *Kaneka*, the Central District of California addressed whether attorneys' fees should be awarded following claim construction "when [plaintiff] should have known that Defendants did not infringe the [asserted] patent." *Kaneka* at 6 (JA2342).  The court ruled:

> To hold that [plaintiff] had to give up its infringement suit after claim construction and prior to the trial court's adjudication of the infringement claim would put future plaintiffs in an untenable position. Early claim construction, performed separately from summary judgment, is a common practice in patent cases. These claim constructions, issued separately from other motions, do not analyze issues of infringement or validity. Without such an analysis, an appellate court cannot properly exercise its appellate jurisdiction. An adverse claim construction issued apart from a case-dispositive motion would therefore put future plaintiffs at the mercy of defendants—plaintiffs would be unable to pursue a case dispositive order and therefore a suitable record for appeal without risking an award of attorney fees.

*Kaneka* at 7-8 (JA2343-44) (internal citations omitted).

The *Kaneka* court may be correct that a meaningful appeal of a claim construction ruling requires some context for the infringement or validity issues at

stake. *See, e.g., Wilson Sporting Goods v. Hillerich & Bradsby*, 442 F.3d 1322, 1331 (Fed. Cir. 2006) (remanding because this Court "had before it absolutely no evidence on record about the accused devices"); *Jang v. Boston Sci. Corp.*, 532 F.3d 1330, 1336, 1338 (Fed. Cir. 2008) (remanding for clarification where it was "impossible to discern . . . which of the district court's claim construction rulings would actually affect the issue of infringement" and that it was "not even clear . . . which claims of the two patents are asserted").

The district court in this case, however, erred in reading *Kaneka* as holding that litigating through summary judgment is *always* necessary to provide that context. In many cases, the required context may be provided by other evidence already in the record before claim construction. *Id.* at 1337-38. And to the extent the record lacks relevant context, the parties may supply the missing information by entering a stipulated judgment that "explain[s] the basis for the infringement determination." *Id.* at 1337.

Accordingly, this Court's precedents do not stand for the proposition that a *per se* rule exists that a plaintiff must be allowed to prolong an infringement claim on which it knows it can no longer prevail. To the contrary, the paradigmatic "exceptional case" occurs when a party is forced to waste money defending against baseless infringement allegations—and this Court has repeatedly affirmed fee-shifting when such circumstances arise following a case-dispositive claim

construction.  *See, e.g.*, *Phonometrics v. Westin Hotel Co.*, 350 F.3d 1242, 1245 (Fed. Cir. 2003) (affirming award of fees post-claim construction);  *MarcTec, LLC v. Johnson & Johnson*, 664 F. 3d 907, 919 (Fed. Cir. 2012) ("MarcTec's decision to continue the litigation after claim construction further supports the district court's finding that this is an exceptional case.");  *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1328 (Fed. Cir. 2013) ("[A] party cannot assert baseless infringement claims and must continually assess the soundness of pending infringement claims, especially after an adverse claim construction."); *Cartner v. Alamo Group, Inc.*, 561 Fed. App'x 958, 969-70 (Fed. Cir. Apr. 11, 2014) (affirming award of fees from "the earliest date upon which all issues of claim construction had been resolved").

The district court therefore erred as a matter of law in relying on *Kaneka* for the erroneous proposition that a plaintiff must *always* be insulated from an exceptional case finding if it continues to dispute infringement post-claim construction regardless of the viability of its infringement theory.  Under the correct legal standard, the district court should have considered the objective merits of Realtime's infringement allegations at the time of the *Markman* order. *See Kilopass Tech., Inc. v. Sidense Corp.*, 738 F. 3d 1302, 1310 (Fed. Cir. 2013) (finding, under the higher pre-*Octane Fitness* standard, that a district court erred in

denying fees when it "reached th[at] determination . . . without addressing the objective merits of [plaintiff]'s claims.").

### 2. At the time of the claim construction order, the record contained detailed evidence establishing non-infringement.

Realtime plainly could and should have proceeded to final judgment immediately after the claim construction order. By the time of the claim construction order, Realtime had reviewed CME's source code, completed its infringement analysis, provided infringement contentions that it told the Court it was "willing to live and die by,"[8] and served its expert report that detailed its final infringement theories and expert analysis. During the *Markman* hearing, CME offered Realtime's infringement contentions into the record and explained the need for a clear ruling on Realtime's "value check" infringement theory for the "data block/field type" terms. JA196 (244:19-23); JA198 (246:13-19); JA225-27.

The record at the time of the claim construction order therefore included enough context for this court to review on appeal the relevant infringement issues. And the court's claim construction order not only acknowledged the case-dispositive difference between the parties' proposed constructions but also expressly rejected Realtime's infringement theory:

---

[8] JA2246-47 (32:21-33:1) ("**Q**. [D]o you feel, plaintiffs, that you have given your best and narrowest shot that you're willing to live and die by, since this case goes back to 2008 on the products and the infringement at issue? **A.** Your Honor, the answer is yes.").

The essential difference between the two constructions is that plaintiff's is broad enough to capture any characteristic or any attribute of data. In other words, **for plaintiff, a single parameter or value of data could fall within the definition of "data field type" or "data block type."**

. . .

Plaintiff argues that a "data block type" or "data field type" can constitute simply an attribute of data—that is, the expression of even a value of data. Dr. Storer testified credibly as one skilled in the art that **checking a value is not determining a data block type or data field type**. The intrinsic evidence does not support the narrow construction proposed by plaintiff. It is clear from the intrinsic evidence alone, and further supported by the credible extrinsic evidence, that "data field type" or "data block type" refers to a content categorization . . .

JA2272-73 (emphasis added).

Thus, at the time of the *Markman* order, Realtime (1) could no longer assert infringement consistent with the court's claim constructions, and (2) could have sought meaningful appellate review of those constructions. Indeed, when the district court later granted summary judgment, it emphasized that the only disputed issue had already been resolved by the *Markman* order:

According to Realtime, a "data type" may be a characteristic of the data block. It is clear from Realtime's description of how it performs this step, that it is performing a value check. **The question is whether there is an issue of fact as to where this value check can constitute content categorization. There is not. The Court resolved this issue in connection with its Markman opinion.**

JA2324-25 (emphasis added).

The district court therefore erred in not finding that this case was exceptional based on the three month period during which Realtime pursued infringement

without having a good-faith basis to assert it. This Court should therefore reverse the district court's order denying attorney fees and remand this case to the district court for a determination of the amount of fees owed. *See, e.g., Shinyei Corp. of America v. United States*, Case No. 2010-1178, 2010 WL 4146384 (Fed. Cir. 2010) (remanding for a determination of the amount of fees). On this record there is no need for remand on the issue of whether this case is exceptional. The district court previously reached its own conclusions on Realtime's position as stated in the order on summary judgment—Realtime's infringement allegations were objectively meritless after the *Markman* order. The district court erred by failing to apply those conclusions in ruling on the exceptional case determination. This Court can reverse and allow the district court to determine the appropriate amount of fees. *See, id.*, slip op. at 9, 2010 WL 4146384, at *4 ("[W]e are convinced that the [court] abused its discretion when it concluded that the government's conduct was substantially justified. We reverse and remand solely for a determination of the amount of fees[.]").

## C. The District Court Abused its Discretion in Declining to Award Fees Given the Abundant Record of Realtime's Litigation Misconduct

In addition to applying an incorrect legal standard, the district court further abused its discretion by disregarding the record of Realtime's vexatious litigation tactics. Realtime not only prolonged litigation (as discussed above) but also actively engaged in a pattern of litigation misconduct that demonstrated bad

faith—filing for and opposing summary judgment on frivolous grounds, having its expert recite newly-invented junk science, and refusing to retreat from thousands of frivolous privilege claims. Realtime's conduct between *Markman* and summary judgment further justifies awarding CME its fees.

### 1. Realtime opposed summary judgment in bad faith.

Although "an inference of bad faith is proper" when a "patentee is manifestly unreasonable in assessing infringement[] while continuing to assert infringement in court," Realtime went a step further by blatantly disregarding and contradicting the Court's claim constructions. *See Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F. 2d 805, 811 (Fed. Cir. 1990).

This Court previously has found sanctions appropriate, even under the higher pre-*Octane Fitness* standard, in circumstances that parallel Realtime's behavior in this litigation. For example, in *Phonometrics*, this Court approved an award of fees between the date of claim construction and summary judgment when a plaintiff "never even accused [defendant] of violating the [asserted] patent as construed" and instead "attempted to slide around" the claim construction. 350 F.3dat 1245, 1248 (Fed. Cir. 2003). Similarly, this Court agreed with an exceptional case finding where a plaintiff made a "decision to advance frivolous and unsupported allegations of infringement premised on mischaracterizations of

the claim constructions" and "had its experts proffer junk science, including a bogus theory." *MarcTec*, 664 F. at 920-921.

Here, after the *Markman* order, Realtime never once accused CME of infringing the patents as construed but instead attempted to "slide around" the court's order in bad faith.  In opposing CME's motion for summary judgment, Realtime facially recited the Court's construction for the data type terms but then did not even attempt to apply it—instead proceeding with its rejected "characteristics" construction and value check theory.  *See, e.g.*, JA343-45.

Realtime also tried to "slide around" the court's *Markman* order in opposing summary judgment by having its expert Dr. Shamos "proffer junk science." Specifically, Realtime fed Dr. Shamos invented data types to recite in his supporting declarations, which he testified that he had never heard of before the Markman order:

> **Q.** [O]thers working for Realtime came up with the alternate suggestion most common value data type; is that correct?
> **A.** Yes.
> **Q.** And that's the first time you ever heard that phrase; correct?
> **A.** I believe so.
> **Q.** And that happened within the last six weeks [*i.e.*, after the Markman order]?
> **A.** Yes.

JA490 (556:5-14); JA446.

2.     **Realtime filed for summary judgment of infringement in bad faith.**

Realtime not only opposed CME's summary judgment motion on frivolous grounds, but also abusively filed its own summary judgment motion and accompanying oppressive and vexatious statement of facts.  Given that the Court's *Markman* order rejected every single one of Realtime's proposed constructions, Realtime could not possibly have believed in good faith that CME infringed as a matter of law—indeed, after CME expended considerable resources responding to Realtime's frivolous motion, Realtime withdrew it from consideration.

When CME raised this point in its request for fees, Realtime responded with several after-the-fact excuses for its decision to file (and withdraw) a motion for summary judgment.  Realtime first argued that its summary judgment "motion presented its genuinely held theory that based on the Court's construction . . . it was entitled to summary judgment[.]"  JA1986.  But Realtime offered no explanation as to why it opposed CME's proposed constructions if there would have been no issue of fact as to infringement under those constructions. Also contradictory to this revisionist history is Realtime's use of its rejected construction of "data type" in the summary judgment motion rather than the Court's construction.  JA343.

Realtime then attempted to defend its conduct by suggesting that it moved for summary judgment "because it did not know which bases, if any, defendants

might raise as grounds for summary judgment of non-infringement" and to avoid "serial summary judgment motion practice and appeals." JA1999-2000.[9] That post-hoc rationalization actually further demonstrates litigation misconduct; a motion for summary judgment is never an appropriate vehicle for pre-empting unvoiced procedural concerns. Had Realtime actually worried about "the possibility of serial summary judgment motion practice," it should have raised that issue with defendants or the court—for example, at the hearing where the parties and the court extensively discussed procedures for managing summary judgment briefing. JA2578. It is untenable that Realtime believed in good faith that the best way to streamline litigation was to file a baseless motion representing that no issue of material fact existed as to defendants' infringement, force CME to respond to that motion, and then withdraw it from consideration.

Realtime's excuse for withdrawing its motion is equally absurd: "With the benefit of having defendants' various summary judgment motions, Realtime was in a position to assess that the motions in CME's priority list would . . . dispose of the entire case[.]" JA2001. That argument again misapprehends "the very purpose of a motion for summary judgment, [which is] to eliminate a trial where it would be unnecessary[.]" *Bouldis v. US Suzuki Motor Corp.*, 711 F. 2d 1319, 1324 (6th Cir.

---

[9] That response also gets the chronology wrong—CME filed its motion for summary judgment of non-infringement on the "data type" terms *two weeks* before Realtime filed their summary judgment motion.

1983). If Realtime believed a trial was ***unnecessary***, they should have maintained their motion rather than "hold [it] over . . . to be renewed post-trial"; if Realtime believed a trial was ***necessary***, they should not have made the motion in the first place. JA2196. Moreover, Realtime could have withdrawn its motion at any time. Instead, Realtime waited until after CME had prepared a response to both the motion and its oppressive statement of facts. Even accepting Realtime's asserted motivation, it is plain that Realtime unnecessarily duplicated proceedings and that CME is entitled to sanctions for the attorneys' fees it incurred as a result.

### 3.    Realtime asserted privilege in bad faith and refused to retreat from those assertions until ordered to certify them.

Realtime also unnecessarily forced CME to spend months litigating literally thousands of frivolous assertions in connection with its privilege log. At every stage, Realtime insisted on the accuracy of its logging, refused to meaningfully respond to CME's complaints, and prolonged resolution of the issue. Realtime's bad faith throughout the course of this dispute is evident from (1) Realtime's false representations to CME and the district court that it had confirmed the accuracy of numerous privilege assertions that it later retracted and (2) the sheer number of inaccurate privilege log entries—following Court-ordered re-review, the log shrunk from 11,585 entries to only 756.

"[T]he obvious misassertion of a privilege or immunity from discovery[] or the withholding of entire documents where only portions of the document are

privileged may establish bad faith and result in sanctions." *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, Case No. 3:7-MC-78, 2007 WL 948154, at *1 (D. Conn. Mar. 26, 2007). Indeed, the Court of Federal Claims recently awarded significant sanctions where 42% of documents on a privilege log contained improper assertions. *See Chevron U.S.A., Inc. v. United States*, 110 Fed. Cl. 747, 807 (Fed. Cl. 2013) ("The bottom line is that after time-consuming review . . . at least 42% of the folders analyzed contained an improper assertion of privilege. . . . Consequently, the court has determined that the appropriate sanction is for the Government to reimburse Chevron for 42% of the legal fees expended[.]"). Realtime's log was over 90% inaccurate.

Moreover, as a result of Realtime's bad faith privilege assertions, CME did not have access to nearly a quarter of Realtime's total document production during the pendency of this case, including during fact discovery, expert reports and depositions, summary judgment briefing, and pre-trial preparation. One court, awarding sanctions against a party for "misconduct in relation to a ***handful*** of documents," recently explained that "[a]ny bad faith assertion of privilege demands serious attention as it undermines confidence in the discovery process." *Glynn v. EDO Corp.*, Case No. 1:07-CV-1660, 2010 WL 3294347, at *8 (D. Md. Aug. 20, 2010) (emphasis added) ("This misconduct does, however, warrant a $20,000 sanction, for which Glynn and TELG will be jointly and severally

responsible."). By comparison, Realtime improperly withheld over 10,000 documents.

In response to CME's request for fees before the district court, Realtime admitted the inaccuracy of its original privilege log but then attempted to shift the blame to two other law firms not involved in this litigation. *See* JA1989 ("[Realtime] recognized in June that the log received from Realtime's other litigation counsel needed revisions[.]"). Realtime bore responsibility for asserting privilege properly in this case, however, and relying on a log without verifying its accuracy—thus forcing CME to conduct the review Realtime should have performed in the first place—is further evidence of misconduct. Realtime should be made to bear the costs that it imposed on CME.

## V. CONCLUSION

For the foregoing reasons, this Court should reverse the district court's denial of CME's request for an exceptional case finding and attorneys' fees award. This Court should remand for a calculation CME's fees from the time of the *Markman* order adopting CME's claim construction to the date of the order for summary judgment, in which the District Court concluded that Realtime's arguments had been "resolved . . . in connection with its *Markman* opinion."

## PRIVILEGE ASSERTION LITIGATION
## TIMELINE AND EXCERPTS

| Date (in 2012) | Event | Joint Appendix |
|---|---|---|
| Fri., May 18 | CME serves privilege log (429 entries), including legend of employees and counsel | |
| Mon., May 21 | Realtime serves privilege log (11,585 entries), no legend provided | JA662-1831 |
| Sat., June 2 | Realtime letter to CME - complaint re: CME privilege log and Caskey memo redaction | JA1927-28 |
| Tue., Jun. 5 | CME letter to Realtime - complaint re: Realtime privilege log | JA1835-51 |
| Fri., Jun. 8 | CME letter to Realtime - response to June 2 letter | JA1930-31 |
| Sun., Jun. 10 | Realtime letter to CME - response to June 5 letter | JA1853-55 |
| Tue., Jun. 12 | Realtime serves affiliate list identifying counsel and third parties | JA1857-60 |
| Wed., Jun. 20 | CME letter to Realtime - response to June 10 letter | JA1862-78 |
| Mon., Jul. 2 | CME e-mail to Realtime - "We are awaiting a response to our June 20 letter." | JA644 |
| Mon., Jul. 2 | Realtime e-mail to CME - "believe we will have a responsive letter out this week" | JA644 |
| Mon., Jul. 9 | CME e-mail to Realtime - "We are still awaiting a response to our June 20 letter." | JA643 |
| Tue., Jul. 10 | Realtime e-mail to CME - "expect to have a responsive letter out soon" and "will be producing some documents in the near term." | JA643 |
| Wed., Jul. 11 | CME e-mail to Realtime - "Please let us know your availability for a meet and confer on Monday, June 16th." | JA2077 |
| Wed., Jul. 11 | Realtime letter to CME - first complaint re: CME privilege log | JA1880-81 |

| | | |
|---|---|---|
| Thu., Jul. 12 | Realtime letter to CME - response to June 20 letter and revised affiliate list | JA1883-86 |
| Sat., Jul. 14 | Realtime letter to CME - second complaint re: CME privilege log | JA1893-94 |
| Mon., Jul. 16 | Realtime e-mail to CME - unable to confer Mon., suggests Tue. | |
| Tue., Jul. 17 | Realtime call to CME - unable to confer Tue., suggests Wed. morning | |
| Tue., Jul. 17 | Realtime e-mail to CME - unable to confer Wed. morning, suggests Wed. evening | |
| Tue., Jul. 17 | CME serves amended privilege log addressing Realtime complaints | JA1939-62 |
| Wed., Jul. 18 | Meet & confer teleconference with Realtime | |
| Wed., Jul. 18 | CME e-mail to Realtime - confirming that "you stated that you would provide us a letter tomorrow identifying the documents (by privilege log entry number) that Realtime will produce" | JA2076-77 |
| Thu., Jul. 19 | Realtime e-mail to CME - "we will be getting a letter to you this evening, but it will be very late, due to a large filing in another case" | JA2076 |
| Thu., Jul. 19 | Realtime letter to CME - follow-up from meet & confer | JA1896-902 |
| Fri., Jul. 20 | CME e-mails letter brief to Court regarding Realtime's privilege log | JA657-60 |
| Fri., Jul. 20 | Realtime letter to CME - identifying additional documents for production | JA1906-07 |
| Fri., Jul. 20 | Realtime e-mail to CME - request that CME withdraw letter brief filed with court | JA647-48 |
| Fri., Jul. 20 | CME e-mails letter brief to Court - "request that the Court delay consideration of our earlier letter until we are able to determine the extent of the dispute that remains" | JA1904 |

| | | |
|---|---|---|
| Mon., Jul. 23 | Meet & confer teleconference with Realtime; Realtime produces 32 additional documents | |
| Tue. Jul. 24 | CME e-mails second letter brief to Court - "far from allaying our concerns, Realtime's document production calls into question the methodology Realtime used to generate its privilege log in the first place" | JA1909-11 |
| Thu., Jul. 26 | Realtime e-mails letter brief to Court responsive to CME's July 20 and 24 letters - "to the extent that CME's [July] 24 letter to the Court can be read to request a broad re-review, Realtime submits that this issue is moot, because Realtime already has re-reviewed the 3750 disputed licensing entries and is providing a small supplemental document production" | JA614-17 |
| Fri., Jul. 27 | CME e-mails third letter brief to Court responsive to Realtime's July 26 letter | JA1924-25 |
| Fri., Jul. 27 | Court issues order requesting copy of log and indicates that it will "select from that log documents for *in camera* review . . . [and] if sufficiently troubled by inappropriate privilege assertions, require a wholesale re-review and certification." | JA2494 |
| Sun., Jul. 29 | Realtime e-mails second letter brief to Court responsive to CME's July 27 letter - "As for CME's ever-evolving attempt to get the Court to order a prejudicial review of thousands of additional entries, Realtime respectfully submits that this overbroad request should be denied." | JA1964-65 |

| | | |
|---|---|---|
| Mon., Jul. 30 | Realtime e-mails letter brief to Court regarding CME's document redaction - "CME bears the burden of establishing the applicability of the attorney-client privilege—its sole basis for redacting portions of the Caskey Memorandum. The burden is a heavy one, because privileges are neither lightly created nor expansively construed." | JA1967-69 |
| Tue., Jul. 31 | CME e-mails letter brief to Court responsive to Realtime's July 30 letter brief | JA1979-80 |
| Thu., Aug. 2 | Court e-mail to all counsel identifying Realtime privilege log entries for *in camera* review | JA2108-09 |
| Fri., Aug. 3 | Court issues order denying Realtime letter of July 29 - "Having reviewed the in camera submission of the unredacted portions of the Caskey Memorandum, the Court agrees those portions clearly and unambiguously demonstrated that they are based on legal advice." | JA2496-97 |
| Thu., Aug. 30 | Court issues order requiring Realtime re-review of privilege log by September 17 - "A partner(s) from McKool should review all of the documents on the privilege log and certify that, following his or her review, he or she believes that whatever documents remain following the re-review meet the legal definition of what is in fact 'privileged' or 'work product.'" | JA2470-72 |
| Wed., Sep. 12 | Court issues order granting Realtime request for three day extension to September 20 | JA2498 |

| | | |
|---|---|---|
| Thu., Sept. 20 | Realtime e-mails letter to Court certifying substantial completion of privilege log review - "756 documents (out of the original 11,585 documents) remain on Realtime's privilege log and these documents are privileged or work product." | JA650-51 |
| Fri., Sept. 21 | Realtime e-mails letter to Court certifying completion of privilege log review - "McKool Smith partners have completed our review of the 218 formerly redacted documents. None of these documents will remain on Realtime's privilege log." | JA2495 |

# ADDENDUM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUN 2 4 2014
```

------------------------------------------------------X
                                    :

REALTIME DATA, LLC d/b/a IXO,       :

                                     :             11-cv-6697-KBF

                      Plaintiff,    :             11-cv-6699-KBF

                                     :             11-cv-6702-KBF

         -v-                   :            MEMORANDUM

                                     :       DECISION & ORDER

CME GROUP INC., et al.,               :

                                     :

                   Defendants.   :
------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      Three motions are currently pending in the above-referenced actions: (1) a motion for attorneys' fees and costs, filed on April 18, 2014 by defendants CME Group Inc. ("CME"), Board of Trade of the City of Chicago Inc., and the New York Mercantile Exchange (collectively, "CME Defendants") (ECF No. 875); (2) a motion for review of the Clerk of Court's denial of costs, filed on May 23, 2014 by the CME Defendants (ECF No. 910); and (3) a motion for review of the Clerk of Court's award of costs to CME, filed on May 27, 2014 by plaintiff Realtime Data, LLC ("Realtime"). Each of these motions will be addressed in turn.

I.    MOTION FOR ATTORNEYS' FEES AND COSTS

      On April 18, 2014, the CME Defendants filed a motion for attorneys' fees and costs and submitted their supporting papers under seal. On May 19, 2014, Realtime filed its opposition (ECF No. 903), and on June 18, 2014, the CME Defendants filed their reply (ECF No. 920).

1

The CME Defendants request that pursuant to 35 U.S.C. § 285, 28 U.S.C. § 1927, and the Court's inherent authority, the Court deem this case exceptional and award: (1) the fees and expenses incurred following the Court's <u>Markman</u> Order until the CME Defendants' motion for summary judgment was granted; (2) the fees the CME Defendants incurred litigating plaintiff's counsel's assertions of privilege; and (3) the fees incurred in preparing the motion for fees and costs now before this Court. (Memorandum of Law in Support of the CME Defendants' Motion for Fees and Expenses ("Defs.' Fees Mem.") at 2-3, April 18, 2014.)

a. <u>35 U.S.C. § 285</u>

Pursuant to 35 U.S.C. § 285, a court may award attorneys' fees to a prevailing party in "exceptional" patent litigation cases. The United States Supreme Court recently held that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." <u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.</u>, – U.S. – , 134 S.Ct. 1749, 1756 (2014). Exceptional cases are not merely those that involve sanctionable conduct. <u>Id.</u> at 1756-57. "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." <u>Id.</u> (citation omitted).

Here, the Court determines that this case is not so exceptional as to warrant an award of fees and costs pursuant to 35 U.S.C. § 285. While plaintiff ultimately

2

did not prevail in the underlying litigation, its conduct was not so extreme or

unreasonable that this case "stands out from others." The CME Defendants believe

that plaintiff should have given up its case following the Court's claim construction;

that it did not do so and ultimately lost on summary judgment does not itself

amount to unreasonable or baseless conduct. In fact, a district court in the Central

District of California recently suggested:

> To hold that [plaintiff] had to give up its infringement
> suit after claim construction and prior to the trial court's
> adjudication of the infringement claim would put future
> plaintiffs in an untenable position. Early claim
> construction, performed separately from summary
> judgment, is a common practice in patent cases. These
> claim constructions, issued separately from other motions,
> do not analyze issues of infringement or validity. Without
> such an analysis, an appellate court cannot properly
> exercise its appellate jurisdiction. An adverse claim
> construction issued apart from a case-dispositive motion
> would therefore put future plaintiffs at the mercy of
> defendants – plaintiffs would be unable to pursue a case-
> dispositive order and therefore a suitable record for
> appeal without risking an award of attorney fees.

(See Pl.'s 5/29/14 Ltr. at 2 (citing Kaneka Corp. v. Zhejiang Medicine Co., No. 11

Civ. 2389, at 8 (C.D. Ca. May 23, 2014)).

Similarly, the fact that plaintiff submitted a privilege log that subsequently

required significant revisions is insufficient to justify a finding that this case is

extreme. While the deficiencies in plaintiff's privilege log did necessitate a great

deal of time and attention on the part of the CME Defendants, there is no indication

that plaintiff acted so unreasonably under the circumstances as to justify an award

of attorneys' fees pursuant to 35 U.S.C. § 285.

3

For these reasons, the CME Defendants' request for attorneys' fees and costs pursuant to 35 U.S.C. § 285 is denied.

b. <u>28 U.S.C. § 1927 and the Court's Inherent Authority</u>

The CME Defendants' request for attorneys' fees and costs pursuant to 28 U.S.C. § 1927 is similarly denied. Pursuant to 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. To impose sanctions under § 1927, "the trial court must find clear evidence that (1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." <u>Agee v. Paramount Commc'ns Inc.</u>, 114 F.3d 395, 398 (2d Cir. 1997). Sanctions under § 1927 require "a clear showing of bad faith on the part of an attorney." <u>Salovaara v. Eckert</u>, 222 F.3d 19, 35 (2d Cir. 2000). "Bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." <u>Id.</u> (internal quotation marks and citation omitted).

Additionally, "a district court has inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons." <u>PSG Poker, LLC v. DeRosa-Grund</u>, No. 06 Civ. 1104, 2009 WL 2474683, at *3 (S.D.N.Y. Aug. 13, 2009) (quoting <u>Sassower v. Field</u>, 973 F.2d 75, 80 (2d Cir. 1992)).

4

There is nothing to suggest that plaintiff's counsel acted in bad faith or vexatiously in litigating this action. There similarly is nothing to suggest that the issues regarding plaintiff's privilege log were the result of conduct taken in bad faith.

Accordingly, the CME Defendants' request for attorneys' fees and costs pursuant to 28 U.S.C. § 1927 is denied.

## II.    MOTIONS FOR REVIEW OF DENIAL OF COSTS

On May 20, 2014, the Clerk of Court entered a Bill of Costs in this case. Two portions of that Bill of Costs are now at issue. First, the CME Defendants challenge the Clerk of Court's denial of $119,362.93 in exemplification and copies allegedly necessarily obtained for use in the case. (Defendants' Memorandum in Support of Motion for Review of Clerk's Denial of Costs ("Defs.' Costs Mem.") at 1, ECF No. 911, May 23, 2014.) Second, Realtime challenges the Clerk of Court's award of $19,458.55 for the costs associated with 18 distinct transcripts; Realtime argues that only seven transcripts, amounting to $7,986.00 in costs, are taxable. (Memorandum of Law in Support of Motion for Review of Clerk's Award of Costs to CME Group Inc. ("Pl.'s Costs Mem.") at 1, ECF No. 914, May 27, 2014.)

### a.  Legal Framework

Federal Rule of Civil Procedure 54(d)(1) provides district courts with the authority to award costs to a prevailing party. "Unless a federal statute, these rules, or a court order provides otherwise, costs – other than attorney's fees – should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). "The clerk may tax

5

costs on 14 days' notice.  On motion served within the next 7 days, the court may review the clerk's action."  Id.

"In reviewing a clerk's taxation of costs, a district court is to 'exercis[e] its own discretion to decide the cost question [it]self.'"  Vuona v. Merrill Lynch & Co., No. 10 Civ. 6529, 2013 WL 1971572, at *1 (S.D.N.Y. May 14, 2013) (quoting Whitfield v. Scully, 241 F.3d 264, 269 (2d Cir. 2001) (internal quotation marks and citation omitted)); see also Cohen v. Bank of N.Y. Mellon Corp., No. 11 Civ. 456, 2014 WL 1652229, at *1 (S.D.N.Y. Apr. 24, 2014) (citations omitted) (explaining that a district court should review a clerk's award de novo).  "However, 'because Rule 54(d) allows costs 'as of course,' such an award against the losing party is the normal rule [ ] in civil litigation, not an exception.'"  Vuona, 2013 WL 1971572, at *1 (quoting Adkins v. Gen. Motors Acceptance Corp., 363 F. App'x 97, 99 (2d Cir. 2010)) (internal quotation marks and citation omitted).

28 U.S.C. § 1920 outlines the specific costs that are recoverable.  See Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 441-42 (1987).

b. Exemplification and Copies

28 U.S.C. § 1920(4) allows recovery of "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case."  In accordance with 28 U.S.C. § 1920(4), Local Rule 54.1(c)(5) provides that exemplifications and copies are taxable.  However, a Committee Note provides the following gloss on that rule:

> The Committee recommends that Local Civil Rule
> 54.1(c)(5) remain unchanged.  This subsection is

6

> authorized by § 1920(4), which allows taxation of "fees for
> exemplification and the costs of making copies of any
> materials where the copies are necessarily obtained for us
> in this case."
>
> Courts in other circuits have begun to address the
> question whether and to what extent the costs of
> electronic discovery can be taxed as costs of copying or
> exemplification. See, e.g., Race Tires America, Inc. v.
> Hoosier Racing Tire Corp., 674 F.3d 158 (3d Cir. 2012).
> Particularly in the absence of authoritative guidance from
> the Second Circuit on the issue, the Committee has
> concluded that it is premature to address this question in
> Local Civil Rule 54.1(c).

According to the CME Defendants, its sought-after costs – which were for

"copying documents to electronic production media" in accordance with paragraph

4(e) of the Discovery Order (e.g., conversion to TIFF, preservation of metadata, OCR

for non-native files, creation of load files) – are recoverable pursuant to 28 U.S.C. §

1920, as amended,[1] and Federal Circuit case law. (Defs.' Costs Mem. at 1 (citing

CBT Flint Partners, 737 F.3d at 1325).) The CME Defendants contend that because

the Second Circuit has not yet addressed the issue, and since the Local Rules have

abstained from taking a position, the Court should use as its guidepost the Federal

Circuit case law on point.

In opposition, Realtime argues that the electronic discovery expenses for

which the CME Defendants seek recovery are not covered by 28 U.S.C. § 1920 and

---

[1] The statute was amended in 2008 to replace the provision covering "[f]ees for
exemplification and copies of papers necessarily obtained for use in the case" with
"[f]ees for exemplification and the costs of making copies of any materials where the
copies are necessarily obtained for use in the case." CBT Flint Partners, LLC v.
Return Path, Inc., 737 F.3d 1320, 1326 (Fed. Cir. 2013) (internal quotation marks
and citations omitted) (emphasis in original).

7

are not taxable. (Memorandum of Law in Opposition to Motion for Review of
Clerk's Denial of Costs to CME Group Inc. ("Pl.'s Costs Opp'n.") at 1-3, ECF No.
916, June 5, 2014.) While the CME Defendants contended in connection with their
initial costs application that their request for \$119,362.93 consists "only [of] costs
for exemplification of documents . . . (e.g., conversion to TIFF, preservation of
metadata, OCR for non-native files, creation of load files), copying documents to
production media, and the taxes for those costs," (Declaration of William Rothwell
in Support of the CME Defendants' Bill of Costs ¶ 6, ECF No. 876-2, Apr. 18, 2014),
Realtime argues that "[t]hese processes and services far exceed the simple
conversion of native files to TIFF and PDF and the scanning of documents to
electronic format which have been allowed on a limited basis by other courts in
other circuits." (Pl.'s Costs Opp'n at 4.) Realtime cites to CBT Flint Partners, 737
F.3d at 1328, itself in support of its argument: "But only the costs of creating the
produced duplicates are included, not a number of preparatory or ancillary costs
commonly incurred leading up to, in conjunction with, or after duplication." (Id.)

Since the Second Circuit has not yet addressed the issue of whether and how
electronic document copying is covered by 28 U.S.C. § 1920, the Court turns to
decisions by other district and circuit courts for guidance. Importantly, the Court
also adheres to Supreme Court precedent that indicates the taxing of costs is to be
administered "in a very limited way." Crawford Fitting Co., 482 U.S. at 444; see
also Taniguchi v. Kan Pac. Saipan, Ltd., – U.S. – , 132 S.Ct. 1997, 2006 (2012)

8

(explaining that "[t]axable costs are limited to relatively minor, incidental expenses").

As mentioned, in <u>CBT Flint Partners, LLC v. Return Path, Inc.</u>, the Federal Circuit, interpreting Eleventh Circuit law, held that the costs associated with converting documents to a certain production format (e.g., TIFF) and protecting metadata during the process of conversion, are taxable costs. 737 F.3d at 1329. While decryption, deduplication, and other activities undertaken to prepare documents for production are not covered, the creation of "load files" – which indicate where one document ends and the next begins – is also taxable. <u>Id.</u> at 1332;[2] <u>see also, e.g.</u>, <u>Akanthos Capital Mgmt. LLC v. CompuCredit Holdings Corp.</u>, No. 10 Civ. 844, 2014 WL 896743, at *10-11 (N.D. Ga. Mar. 7, 2014) (holding that "[t]he cost of converting [electronically-stored information] format to TIFF may be taxable as a modern analogue to photocopying paper documents" and "[o]ther tasks, such as digitizing paper documents, may also be taxable").

The Third Circuit and Fourth Circuits take a narrower view. These courts agree that scanning hard copy documents and converting native files to TIFF are taxable (as is converting VHS tapes to DVD), but do not otherwise allow for the taxation of costs associated with document production. <u>Race Tires</u>, 674 F.3d at 171; <u>Country Vinter of N. Carolina, LLC v. E. & J. Gallo Winery, Inc.</u>, 718 F.3d 249, 261

---

[2] Whether the additional information potentially included in a load file, such as metadata or extracted text, is also covered depends "on whether that information is required to be produced, in which case it is part of the cost of 'making copies.'" <u>CBT Flint Partners, LLC</u>, 737 F.3d at 1332.

9

(4th Cir. 2013) (adopting the Third Circuit's rationale and holding). Hard-drive imaging and metadata extraction are not taxable because in the Third Circuit's view, they are preparatory in nature as opposed to part of the "copying" process. Race Tires, 674 F.3d at 169-70.[3]

A number of district courts in the Northern District of California have held that "TIFF and OCR conversion, Bates stamping, load file and other physical media generation are recoverable as copying fees under section 1920(4)." Kwan Software Eng'g, Inc. v. Foray Techs., LLC, No. 12 Civ. 3762, 2014 WL 1860298, at *4 (N.D. Ca. May 8, 2014) (internal quotation marks and citation omitted) (citing cases); Plantronics, Inc. v. Aliph, Inc., No. 09 Civ. 1714, 2012 WL 6761576, at *3 (N.D. Cal. Oct. 23, 2012) (finding as taxable converting to TIFF, OCR, scanning and converting to PDF, image endorsement, and electronic reproduction to media).

However, certain district courts have held otherwise. For example, at least one court held that that Bates matching and OCR are used to make the process of document production more efficient, but do not constitute "copying" under the language of the statute. See Amana Soc., Inc. v. Excel Eng'r, Inc., No. 10 Civ. 168, 2013 WL 427394, at *6 (N.D. Iowa Feb. 4, 2013). Another court reasoned that TIFF conversion is only a necessary (and thus taxable) cost when production of the native documents is not an option. See Eolas Techs., Inc. v. Adobe Sys., Inc., 891 F. Supp. 2d 803 (E.D. Tex. 2012) (refusing to allow costs for conversion of documents to TIFF

---

[3] The Seventh Circuit has characterized taxable costs as those amounts spent on "converting computer data into a readable format in response to [the losing side's] discovery requests." Hecker v. Deere & Co., 556 F.3d 575, 591 (7th Cir. 2009).

10

because the parties agreed documents could be produced either in native format or TIFF and thus, the cost of conversion was not "necessarily obtained for use in the case") (emphasis in original).

Here, the Court finds that the costs requested by the CME Defendants reach beyond that which is covered by the applicable framework – at least as it currently exists. While the CME Defendants contend that their proposed $119,362.93 figure consists solely of the amounts incurred in the basic copying and exemplification of documents, this figure is too high to constitute reasonable, "incidental" costs under the circumstances of this case.

Accordingly, and particularly in the absence of either Second Circuit precedent or a Local Rule instructing otherwise, the Court declines to award the sought-after $119,362.93. Instead, the Court awards $30,000 for the costs associated with exemplification and the copying of documents in this case. The Court finds $30,000 to be commensurate with its understanding of the costs associated with converting documents into electronic form in a case of this size.

c. Deposition Transcripts

28 U.S.C. § 1920(2) provides that fees for "printed or electronically recorded transcripts necessarily obtained for use in the case" are taxable. Local Civil Rule 54.1(c)(2) provides, inter alia:

> Costs for depositions are also taxable if they were used by the Court in ruling on a motion for summary judgment or other dispositive substantive motion. Costs for depositions taken solely for discovery are not taxable.

11

Realtime argues that only seven of the 18 transcripts for which costs were taxed were actually "used by the Court" in any substantive summary judgment rulings on the merits and thus, only $7,986.00 in costs should have been awarded to the CME Defendants. (Pl.'s Costs Mem. at 1.) Realtime explains that the remainder of the transcripts were submitted in connection with summary judgments motions that were denied without prejudice "pursuant to the Court's request for 'prioritization' and the agreement of the parties." (Id. at 2.) According to Realtime: "Because the Court never considered the merits of these motions or the applicability of the deposition transcripts to CME's arguments, these transcripts cannot be said to have been 'used by' the Court for purposes of the motions and are, therefore, not taxable." (Id.)

In response, the CME Defendants argues that because the relevant depositions "appear to be reasonably necessary and were submitted in support of CME's motions for summary judgment," rather than solely for the purpose of discovery, they were properly taxed by the Clerk of Court. (Memorandum of Law in Opposition to Realtime's Motion for Review of Clerk's Award of Costs ("Defs.' Costs Opp'n") at 2, ECF No. 917, June 9, 2014 (citing cases).)

The Second Circuit has interpreted Local Civil Rule 54.1(c)(2) as follows:

> The plain language of the Rule's first sentence, providing that depositions are taxable if "used or received in evidence at the trial," suggests that the word "use" extends well beyond explicit reliance on the deposition as a basis for decision. In addition, the second and third sentences, allowing taxation if the deposition was "used by the court in a ruling on a motion for summary judgment" but not if "taken solely for discovery," further

12

> suggest an either-or dichotomy between depositions
> submitting in conjunction with a motion for summary
> judgment, on the one hand, and purely investigative
> depositions never actually submitted to the court for its
> use, on the other.

Whitfield, 241 F.3d at 271 (emphasis omitted). The Second Circuit went on to explain that "the filing of a deposition transcript [in connection with a motion for summary judgment] necessarily means a court will 'use' it, since summary judgment may be granted only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)) (adding emphasis); see, e.g., Cohen, 2014 WL 1652229, at *3 (holding that a particular transcript was taxable because it was attached as an exhibit to an affidavit filed in support of a motion for summary judgment and was cited in defendant's memorandum of law).

Here, there is no dispute that the depositions in question were not for investigatory purposes – they were submitted in connection with the CME Defendants' summary judgment motions. As a result, they were properly taxed under the law. The Court therefore affirms the Clerk's award of costs for the CME Defendants' depositions.

III.    CONCLUSION

For the reasons set forth below, the Court hereby DENIES the CME Defendants' motion for attorneys' fees and costs, GRANTS IN PART the CME Defendants' motion for review of the Clerk of Court's denial of costs for

13

exemplification and copies, and DENIES Realtime's motion regarding imposition of costs for certain deposition transcripts.

The Clerk of Court is directed to terminate the motions at ECF Nos. 875, 910, and 913 in Case No. 11-cv-6697, ECF Nos. 226 and 229 in Case No. 11-cv-6699, and ECF Nos. 265 and 268 in Case No. 11-cv-6702.

SO ORDERED.

Dated:      New York, New York
            June 2⁴, 2014

                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge

14

Respectfully submitted,

 */s/ Scott F. Partridge*
Scott Partridge
scott.partridge@bakerbotts.com
Michael Hawes
michael.hawes@bakerbotts.com


Baker Botts, LLP
910 Louisiana St.
Houston, TX  77002-4995
Telephone:   (713) 229-1750
Facsimile:    (713) 229-7750

*Attorneys for Defendants-Appellants
CME Group, Inc.; Board of Trade of
the City of Chicago, Inc.; and the
New York Mercantile Exchange, Inc.*

## CERTIFICATE OF SERVICE

I, Deborah Saucier, Senior Paralegal, employed by Baker Botts LLP,  hereby certify that on the 29th day of September, 2014 I caused one copy of  the

BRIEF FOR DEFENDANTS – APPELLANTS CME GROUP, INC.,
BOARD OF TRADE OF THE CITY OF CHICAGO, INC., AND
THE NEW YORK MERCANTILE EXCHANGE, INC.

to be filed, via CM/ECF  with:

Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

and to be served via CM/ECF on each of the following counsel of record:

Dirk D. Thomas
Brett Cooper
McKool Smith P.C.
1999 K Street, NW Suite 600
Washington, DC 20006
(202) 370-8300
(202) 370-8344
Dthomas@MckoolSmith.com
**REALTIME DATA, LLC (d/b/a/ IXO)**

*/s/ Deborah L. Saucier*
Deborah L. Saucier
Senior Paralegal
Baker Botts LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
(713) 229-1359
Email: deborah.saucier@bakerbotts.com

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(B)

In reliance upon the word-count feature of the word-processing system used to prepare this brief, I hereby certify that this brief contains 8,248 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).